## SAMSON–UNITED CORPORATION v. SEARS, ROEBUCK & CO., Inc.

### No. 8447.

District Court, E. D. New York.
June 20, 1938.

Pennie, Davis, Marvin & Edmonds, of New York City (W. Brown Morton and Raymond B. Canfield, both of New York City, of counsel), for plaintiff.

George L. Wheelock, of New York City (Zabel, Carlson, Gritzbaugh & Wells, and Arthur W. Carlson and Max W. Zabel, all of Chicago, Ill., of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit in Equity for the alleged infringement of Patent No. 2,095,223 issued to Abe O. Samuels, Assignor to Samson-United Corporation for Fan, granted October 5th, 1937, on an application filed October 2nd, 1935.

The defendant, Sears, Roebuck & Co. Inc., is only a nominal defendant, the real defendant being the Excell Auto Radiator Company, the manufacturer of the accused article, which has taken over the defense of the suit.

The act charged to constitute the infringement was the sale of an automobile fan (Exhibit 3) by the Sears, Roebuck branch store in Jackson Heights, Long Island, New York.

The plaintiff is a corporation existing under and by virtue of the laws of the State of Delaware, with its principal place of business at Rochester, New York.

The defendant, Sears, Roebuck & Co., Inc., is a corporation organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at Chicago, Illinois, and with a regular and established place of business at 84–02 Roosevelt Ave., Jackson Heights, L. I. N. Y., within the Eastern District of New York.

The subject matter of the Patent is an electric fan with soft rubber blades instead of metal or rigid blades. It is manufactured for home and office use, as well as for use in automobiles.

The advantages claimed for the rubber fan are its safety and quietness, which, it is contended, are obtained without in any way sacrificing its ability to create a current of air.

The fan has met with public acceptance and commercial success.

The fans manufactured by plaintiff were put on the market in 1936, before the Patent issued.

Up to that time plaintiff had not been in the business of manufacturing fans, but had been in the business of manufacturing toasters, flat irons, waffle irons, food mixers and other household electrical utensils.

It was due to the alleged invention of the rubber-bladed fan that plaintiff entered into the fan business. Only one type of fan, that of the 10 inch stationary fan for home and office use, was offered by plaintiff for sale, when it entered the market in 1936.

Plaintiff has a score of competitors making fans of many different styles, shapes and prices. Among them were the large representative Electric Companies, but in spite of this, the sales of the plaintiff, during the Summer of 1936, of the rubber-bladed fan, were very large.

Plaintiff also brought out the automobile fan for the 1936 and 1937 Winter trade, and sold all that it could make, and could have sold many more, if it had the facilities to manufacture them. By the 1937–1938 season, the metal-bladed automobile fan had practically disappeared from the market.

During the first season the plaintiff had the rubber-bladed fan field to itself. In the second season it met with competition, on the part of eight or ten manufacturers, but when the patent came out, eight of these manufacturers took licenses under the Patent. The maker of the alleged infringing fan and two others have not taken out licenses.

The invention of the Patent in suit is described by the Patentee in the specification, as follows:

"This invention relates to fans for producing air currents and has for its principal object to provide such a fan with flexible fan blades of suitable material and shape to give the blades stability for an efficient operation of the fan combined with sufficient flexibility to cause any portion of the moving blades to yield when a stationary rigid or semi-rigid member is brought in contact with them, and to be self-restoring to normal position when the intruded member is withdrawn.

"Another object of this invention is to so construct and mount the blades of the fan that a temporary deflection of a portion of the fan blades will not prevent the fan from operating to produce a movement of air.

"A further object of this invention is to construct the fan with flexible material which may have suitable ballast incorporated therein to properly balance the fan blades and provide a steady operation of the fan.

"A further object of this invention is to provide the fan blades with novel fastening means and a novel mode of mounting to provide for a quick and efficient attachment of the blades to the rotating member in a normally radial position thereto.

"A still further object of my invention is to provide a fan which is almost entirely noiseless in operation." (Page 1, lines 19 to 48.)

The fan, as described by the Patentee, embodies a structure, which provides substantial air resistance or the so-called axial thrust, and at the same time allows the blade to deform, if it strikes accidently an obstacle such as a hand, which comes in contact with the edge of the blade.

Further, it seems to me, that the Patent requires, and the fan embodies, a blade structure that may be bent over by striking against some object, without being permanently bent or broken, which will return immediately to its normal position, as soon as the deforming force has been removed. Both the patented fan and the ordinary metal-bladed electric fan operate as does a screw propeller to produce a beam of air which is sent out into the room in the direction of the axis of rotation of the fan.

The mere change from metal blades to rubber blades, would not be invention, because that would be a mere substitution of material, but where, by reason of other changes, which produced a new article, then there would be something more than a mere substitution of material, which might constitute invention.

All of the claims of the Patent in suit, with the exception of claims, 11, 12, 16 and 17, formed the basis of the present action, and plaintiff, by its brief, also withdraws claims 14 and 15, which leaves for consideration, claims 1 to 10 inclusive, and 13 and 18.

Claims 1, 2, 3, 10 and 13 are typical of the 12 claims upon which plaintiff now relies.

Claim 1 reads as follows: "A fan comprising a hub with radially projecting blades carried thereby, said blades being formed at their outer portions of material sufficiently flexible to bend readily without permanent distortion, and the inner end portions of said blades being of a construction and configuration such that said blades are sufficiently rigid to maintain a substantially radial position at all times." This is the broadest claim.

Claim 2 reads as follows: "A fan comprising a hub with radially projecting blades carried thereby, said blades being formed at their outer portions of material sufficiently flexible to bend readily without permanent distortion, and the inner end portions of said blades being of an obliquely curved configuration and a construction such that said blades are sufficiently rigid to maintain an effective pitch angle upon rotation."

This claim is more limited than claim 1, in that it specifically describes the ob-

liquely curved configuration of the blades at their line of attachment to the hub.

Claim 3 reads as follows: "A fan comprising a hub with radially projecting blades formed of material sufficiently flexible to bend readily without permanent distortion, the inner end portions of said blades being maintained sufficiently rigid by said hub and of a configuration to increase the resistance of said blades to axial thrusts without materially increasing their resistance to deformation upon encountering an object in their path of rotation."

Claim 3 is more limited than claim 1, in that it defines the blade structure in terms of the greater resistance to axial thrust imparted to the soft flexible blade material by the configuration of the blade and its attachment to the hub.

Claim 10 reads as follows: "In a fan hub and blade structure, a hub having slots in its periphery to receive fan blades, and a plurality of fan blades having enlarged shoulder portions on their mounting ends, said fan blades being formed of material sufficiently flexible and resilient to be self-sustaining and to be self-restoring when distorted from their normal positions, said fan blades being received into said slots by their said shoulder portions and held in a substantially radial position on said hub."

Claim 10 is more limited than claim 1, in its details of construction.

Claim 13 reads as follows: "A fan comprising a rotatable hub having a plurality of oblique arcuate slots and a plurality of normally flat, rubber blades adapted to be supported on said hub and maintained in cupped position by said slots."

Claim 13 is more limited than claim 1, in that it describes the blades as rubber blades maintained in cup position by oblique arcuate slots on the hub.

Claims 1 and 2 describe the blade material as sufficiently flexible to bend readily without permanent distortion.

Claims 4, 5, 7, 8, 9, 10 and 18 describe the blades as sufficiently flexible and resilient to be self-restoring, when distorted from normal position or when striking an object.

Claims 6, 7 and 13 are limited to rubber blades.

The Patent in suit, in addition to requiring rubber or other yielding blades, relates to other features, one of which relates to the manner in which the rubber blades of the Patented structure are mounted in the more or less eliptical head 1, of the rotating element. As shown in Figs. 2, 3 and 4 thereof, the structure involved consists of the blade 3, and an enlarged locking ridge or shoulder 4, the eliptical head 1 of the revolving structure being provided with slots 2 and 2A, the slot 2A being larger to accommodate the shoulder 4, and the slot 2 being merely of the width to accommodate the thickness of the fan blade. This measure of mounting is described in page 2, column 2, lines 14 to 21 of the Patent in suit.

Another feature found in various claims defines the fan blades and their mounting to be of such a character that the blades are cupped. Such cupping is defined in the Patent by saying that the blades "are obliquely curved so as to hold the flexible blades at the proper curvature for a sufficient displacement of air thereby and to hold the blades in a normally radial position on the housing."

There is no novelty in cupping blades to provide a sufficient displacement of air, as practically all fan blades are cupped for that purpose.

Another purpose attributed to this cupping is that of maintaining a radial position of the blades, that is, stability. There can, however, be no novelty or invention in cupping the blades for that purpose, because it has been common practice where articles are not in themselves strong enough to perform a function, either to bend, or cup, or corrugate in countless ways in order to strengthen the element by giving it other than a flat surface.

The defendant offered a number of Prior Art Patents. The British Patent 3203 A. D. 1899 to Siemens Brothers & Co. Ltd., has no drawing, but it fully describes a fan having rubber blades, the word "Caoutchouc" meaning "India Rubber". That patent does not say that the blades are self-sustaining, but likewise it does not say that when the blades are of the rubber "Caoutchouc" they are not self-sustaining.

Patent No. 1,308,527 to L. G. Nilson, granted July 1st, 1919 shows an airplane propeller with a yielding rubber extremity 10 of such nature that injury to the propeller may be avoided if the tip of the propeller touches the ground.

Patent No. 1,868,113 to F. Ljungstrom dated July 19th, 1932 shows a fan with veins made of ribbons or strips of cloth,

chamois skin, canvas, duck or other flexible and limp or non-elastic material.

Patent No. 1,042,431 to Griggs granted October 29th, 1912, shows a fan having 13 blades, which are not made of rubber, but which are made of self-sustaining felt.

The blades of the Griggs Patent are yielding and flexible and have a reverse curve for the purpose of stability, at least, in so far as their mounting is concerned.

Patent No. 1,392,029 to J. D. Turner, granted September 27th, 1921. That Patent shows a fan having flexible blades, which would avoid injury to human hands if they contacted with such blades. The blades of the fan are arranged in a form of a propeller, the blades being of a paddle wheel type. No cupping of the blades is shown as they are self-sustaining, as shown. Clearly self-sustaining blades are shown in the Prior Art and the Patentee did not make any invention by providing what he terms "the self-sustaining blades", in fact, I do not see that he can claim any invention by saying that in his structure the blades are normally self-sustaining, because, in view of all the references cited, he, of necessity, would be obliged to bring himself between Ljungstrom reference No. 1,866,113, the blades of which he characterizes as "too limp" and the blades of Nilson No. 1,308,527, which he characterizes as "not sufficiently yielding", and in so doing is met by the British Patent 3203 to Siemens and the Griggs Patent No. 1,042,431.

The prior use of the Griggs flexible fan attachment is shown and it clearly appears that the blades there used were self-sustaining and made of yielding, flexible material.

Claim 7 of the Patent in suit except for the use of the word "rubber" reads directly upon this device, but there can be no invention in the use of rubber fan blades as a desirability of rubber "Caoutchouc" fan blades had already been disclosed in the Siemens Patent.

As I have hereinbefore stated, the use of cupping to obtain stability was so well known in the Art, as not to require any citation of authority.

While there are no claims directed to a rotatable carrier of the general ellipsoidal form, there was no inventive characteristic to be attributed on that score to the Patent in suit. See Gosling Design Patent No. 89,076.

Blades having enlarged extensions which fit into T-shaped slots to hold them in place were known to the Art. See Wanless Patent No. 612,598 but the ridges of the blades of the Patent in suit contracted by the pull of the centrifugal force to wedge themselves tighter in the slot, is not shown.

A number of Patents were offered in evidence to show the method or means to mount blades, but they did not show the method or means disclosed by the Patentee in the Patent in suit, therefore, it seems to me that the invention of the Patent in suit is found in the mounting of the blades in a more or less elliptical head 1 of the rotating element.

In defendants' structure the blades are shown as in Figs. 4 and 5 of Exhibit F. There are 4 blades which are held together by a central web slitting between the blades is shown most clearly in Fig. 4 as these slittings extend to within a short distance of the central web.

The webbing has a hole 14, and also 4 buttons 15 for the purpose of holding the whole structure in place between 2 separable elements, which together form the rotatable carrier.

The lower one of these separable elements is shown in Figs. 7 and 8 and the cap plate is shown in Figs. 9 and 10. These elements are molded, and are so curved, that they form the blades into the shape as shown in Figs. 1 and 2 when these two mounting elements fit together. Holes 16a, are provided to receive the buttons 15, and as shown in Fig. 6, a screw 18 holds the two mounting elements together, this screw at the same time passing through the central hole 14 in the blade webbing.

The blades of the defendant are self-supporting in the position shown in Figs. 1 and 2 and the defendant's blades are cupped as is also shown in the drawings, but it seems clear to me that the defendant does not use the mounting features of the Patent in suit, but uses rather the mounting arrangement disclosed in the Kempton Patent No. 1,430,561.

Consideration of the file history of the Patent in suit convinces me that the Patentee was denied broad protection on a rubber blade fan, and as I have reviewed the Prior Art, it seems to me, that the Patent, if sustained, can be sustained only because of detail structural claims.

It is quite difficult to understand exactly what some of the claims are really

intended to cover, and the claims are numerous, but taking into account the looseness of the language employed, and considering the Prior Art that was cited by the Patent Office, it would seem to me, that what was in the Examiner's mind was the enlarged mounting portion at the inner ends of the blades of the Patent in suit, and the manner in which the blades could be slid sidewise into the slot, and this appears from the repeated rejections of prior claims.

Of course, no estoppel would arise by reason of any argument before the Patent Office, but only by reason of the amendment of more limited claims after the rejections of broader ones, but the many rejections, which were had in the progress of this Patent, through the Patent Office, convinced me that it was not intended to grant the Patent, broadly for a rubber-bladed fan.

With this in mind, we will turn to a consideration of the claims in suit.

Claim 1 defines the inner end portions of the blades to be "of a construction and a configuration such that the blades are sufficiently rigid etc.".

No special construction of their inner end is found in the defendant's blades.

Claim 2 has the same limitation.

In view of the Prior Art, it does not seem to me that either of said claims could be held to be valid, unless it is limited to the particular structural strengthening rib 4 of the Patent in suit.

Claim 3 defines the inner end portions of the blades as "of a configuration to increase the resistance of said blades to actual thrust".

The reference there is also to the enlargement which is supposed to wedge itself into position as defined in the Patent.

Claim 4, after referring to the means on the blades, which coact with the hub, defines them as being "the means which substantially give sufficient rigidity when positioned on said hub by the means aforesaid".

Claim 5 makes particular reference to the means on the base portions of the blades in holding them in position.

Claim 6 defines the hub, the rubber blades and means coacting with the hub and the base portions of said blades to maintain the blades in a self-sustained rigid position. As these means are supposed to coact with the hub, they must be the particular means on the blades, that is, the enlarged rib section.

Claim 7 appears to be broader in this respect, and if valid, would probably be infringed by defendant's structure.

Claim 8 refers to the slots in the hub and blades having portions fit in the slots impliedly that refers to the enlarged portions which prevent the blades from leaving the slots.

Claims 9 and 10 are limited to having "enlarged shoulder portions".

Claim 13 includes the slots. Defendant's structure does not have those slots.

Claim 18 defines the inner portions of the blades as having a "construction and configuration such that said blades are sufficiently rigid etc.". That again refers to the enlarged portion.

It, therefore, seems to me that all of the claims in suit, except claim 7, are directed to the enlarged ridge on the inner portions of the blades of the Patent in suit.

Claim 7 does not appear to be so limited, and it does not seem to me that the wording of claim 7, if broadly construed, can be reconciled to the actual construction.

The claim includes all of the hub and the rubber blades, then claims "means engaging portions of said blades for maintaining etc.". Whether these means are on the hub or not, is not stated. If they are on the hub, then they must be the surfaces of the hub interiorly of the slots 2 against which the enlargements press.

The advance, if any, in the Art, by the Patent in suit, is very slight, and would not sustain the broad invention claimed in claim 7.

If claim 7 can be read on the defendant's structure, then claim 7 is invalid.

■ The defendant, as I have hereinbefore shown, does not use the mounting features of the Patent in suit and, therefore, does not infringe.

Plaintiff makes much of its claimed commercial success, but I do not feel that it is aided thereby, as the success in question appears to be due to the popular approval of a rubber-bladed fan for automobile windshield defrosting purposes.

It is true that the plaintiff also shows that it had made a great many rubber-bladed fans of a certain size in 1936 and 1937, which were not intended for automobile use.

While it appears that the rubber-bladed fan intended for automobile use has struck popular fancy and may supplant the metal-bladed fan, the same can not be said of the other type of fans manufactured, by plaintiff, as their number was but a fraction of the total number of metal-bladed fans manufactured and sold by all manufacturers. Plaintiff also shows the taking of licenses by a number of manufacturers, but when all is said and done, commercial success, is not proof in and of itself of invention, and may only be turned to, when there is doubt on the question of validity.

The claims in suit as I have shown they are limited, are valid, but if attempted to be construed broadly as covering rubber-bladed fans, without the limitations I have referred to, they would be undoubtedly invalid, and commercial success would not sustain them.

The defendant does not infringe any of the claims of the Patent in suit, on which this suit is based, with the possible exception of claim 7, and if claim 7 be so read as to cover the defendant's structure then claim 7 would be invalid.

A decree may be entered in favor of the defendant, against the plaintiff, dismissing the bill of complaint, on the merits, with costs.

Settle decree on notice.

Submit proposed findings of fact, and conclusions of law, in accordance with this opinion, for the assistance of the Court, as provided by Rule 70½ of the Equity Rules, 28 U.S.C.A. following section 723, and the Rule 11 of the Equity Rules of this Court.